WO            IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


GWITCHYAA ZHEE CORPORATION and       )
GWICHYAA ZHEE GWICH'IN TRIBAL        )
GOVERNMENT,                          )
                                     )
                     Plaintiffs,     )
                                     )
        vs.                          )
                                     )
CLARENCE ALEXANDER and DACHO         )
ALEXANDER,                           )
                                     )            No. 4:18-cv-0016-HRH
            Defendants/Third-Party Plaintiffs,    )
                                     )
        vs.                          )
                                     )
DAVID BERNHARDT, Acting Secretary    )
of Interior, in his official capacity, )
                                     )
            Third-Party Defendant.   )
_____)


O R D E R

Cross-motions for Summary Judgment

        Plaintiffs move for summary judgment on Clarence Alexander's § 14(c)(1) claim.[1]

This motion is opposed,[2] and defendants move for summary judgment against plaintiffs.[3]

_____

        [1]Docket No. 153.

        [2]Docket No. 165.

        [3]Docket No. 163.

Defendants' motion for summary judgment is opposed.[4]  Oral argument was requested and has been heard.

Facts

Plaintiffs are Gwitchyaa Zhee Corporation ("GZ Corporation") and Gwichyaa Zhee Gwich'in Tribal Government.  Defendants are Clarence and Dacho Alexander.

This case involves Clarence's § 14(c)(1) claim under the Alaska Native Claims Settlement Act ("ANCSA").  "ANCSA extinguished all aboriginal title and claims of aboriginal title to lands in Alaska in exchange for the distribution of $962,500,000 and over forty million acres of land to Alaska Natives." Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton, 360 F.3d 972, 974 (9th Cir. 2004).  "ANCSA did not convey lands directly to village or regional corporations, but provided a method for accomplishing transfer." Id. Pursuant to ANCSA, public lands were withdrawn and then village and regional native corporations could select the lands to which they were entitled. Id. at 974-75.  After a selection was made by a village corporation, the Secretary of Interior was directed to determine how many acres the corporation was entitled to and then issue "a patent to the surface estate. . . ." 43 U.S.C. § 1613(a).  If, however, the lands had not been surveyed, the Secretary was to convey lands to Native corporations by an "interim conveyance." 43 U.S.C. § 1621(j)(I).  A patent would be issued once the lands in question had been surveyed. Id.

---

[4]Docket No. 177.

Section 14(c)(1) of ANCSA provides that once a village corporation received a patent, the corporation was to

> convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied as of December 18, 1971 . . . as a primary place of residence, or as a primary place of business, or as a subsistence campsite, or as headquarters for reindeer husbandry[.]

43 U.S.C. § 1613(c)(1). "To facilitate the transfer of section 14(c) properties to lawful claimants, the Secretary of the Interior enacted regulations requiring the survey of the lands claimed by the villages." Ogle v. Salamatof Native Ass'n, Inc., 906 F. Supp. 1321, 1328 (D. Alaska 1995). 43 C.F.R. § 2650.5–4 "requires village corporations to file a map delineating its land selections, including tracts that are to be reconveyed under section 14(c)." Id. "The map is then used by the Bureau of Land Management ('BLM') as a 'plan of survey.'" Id. Once the surveys were completed, the BLM was to submit an official plat to the village corporation showing the boundaries for all § 14(c)(1) claims. After the village corporation approved the official plat, the village corporation issued deeds to the § 14(c)(1) claimants.

On October 30, 1984, Clarence submitted a § 14(c) application to GZ Corporation.[5] Applicants were required to attach a "sketch map of the parcel" being claimed.[6] There is a sketch map attached to Clarence's § 14(c) application which indicates that he was claiming a triangular-shaped parcel, approximately 5.77 acres in size, that did not include the Joe

---

[5]Exhibit A, Plaintiffs' Motion for Leave to Amend Complaint, Docket No. 81.

[6]Id. at 2.

Ward barge landing area or the pond.[7]  Clarence has testified that the handwriting on this

sketch map is not his and that he believed that his § 14(c) application had a different sketch

map attached.[8]  But, the Alexanders have not been able to come forward with a copy of this

other sketch map.[9]  In his application, Clarence indicated that he had occupied the land in

question since 1974, when he "purchased the house from James Ward, Sr."[10]

GZ Corporation received an interim conveyance of the lands at issue in this lawsuit

on March 22, 1985.[11]

On August 6, 1990, GZ Corporation approved Clarence's § 14(c) application.[12]  On

August 7, 1990, GZ Corporation notified Clarence that his § 14(c) application (application

---

[7]Id. at 12.

[8]Deposition of Clarence Alexander at 78:1-80:21, Exhibit C, Plaintiffs' Motion for
Summary Judgment [etc.], Docket No. 153.

[9]Clarence Alexander testified that his papers were destroyed a few years ago when
there was a fire at his house.  Id. at 79:4-9.

[10]Exhibit A at 3, Plaintiffs' Motion for Leave to Amend Complaint, Docket No. 81;
see also, Exhibit J, Plaintiffs' Motion for Summary Judgment, Docket No. 153 (Jan. 7, 1974
document in which Jim Ward Sr. stated that "I . . . hereby sell to Clarence Alexander one (1)
cabin located down on native land by a slough known as McInroy Slough or Joe Ward
Slough").  Plaintiffs contend that Clarence only purchased an "improvement" on the land,
namely the house or cabin and that he did not purchase any interest in the real property or
Ward's 14 (c) claim.  Thus, they suggest that Clarence was not entitled to any § 14(c)
conveyance.  But that is not an issue before the court in this case.

[11]Exhibit A, Plaintiffs' Motion for Summary Judgment, Docket No 153.

[12]Resolution 90-2, Exhibit D, Plaintiffs' Motion for Summary Judgment, Docket No.
153.

#002) "for primary place of residence" had been approved.[13]   GZ Corporation advised

Clarence that "[t]he next step in this long process is to prepare your claim in a plan of

survey. . . ."[14]

In 2007, GZ Corporation hired Fort Yukon resident and GZ Corporation shareholder

Gary Lawrence to complete the Fort Yukon Map of Boundaries ("FYMOB").[15]  Lawrence

testified that he did not have a surveying background, that he did not do any physical surveys

of any of the § 14(c) claims, and that he did not post any of the proposed boundaries for the

§ 14(c) claims.[16]  Lawrence testified that he worked off of other people's maps.[17]

 On June 27, 2007, the patent for the lands involved in this lawsuit was issued to GZ

Corporation.[18]

In November 2007, Lawrence sent a letter to all § 14(c) applicants advising them that

he would be meeting with each applicant "to develop a strip map" and advising that "[e]ach

applicant is awarded 5 acres[. Y]ou can have less than 5 acres, but you can't go over unless

---

[13]Exhibit C, Affidavit of Defendant Clarence L. Alexander, Docket No. 14-2.

[14]Id.

[15]Deposition of Gary Lawrence at 6:3-21, Exhibit I, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[16]Lawrence Deposition at 39:22-40:7, Exhibit A, Defendants' Motion for Summary Judgment against Plaintiffs, Docket No. 163.

[17]Id. at 40:8-11.

[18]Exhibit B, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

it was approved when your application was approved by the corporation."[19]  At his deposition, Clarence agreed that this letter had been sent to his correct mailing address, but he testified that he did not remember receiving the letter.[20]  Lawrence testified that he included a copy of the strip map with the letter he sent to Clarence, but it is not clear if this was the hand-drawn sketch map discussed above.[21]

Lawrence testified that he spoke to Clarence about a month after sending the letter and told Clarence that his claim was "over 5 acres.  So he told me that he didn't want the lake. . . . [H]e told me that he didn't want the lake so I cut it out."[22]  Lawrence later appeared to change his mind as to when this conversation took place, suggesting it may have been in the summer of 2008.[23]  Clarence denied ever speaking to Lawrence about the boundaries of his

---

[19]Exhibit R at 1, Plaintiffs' Reply [etc.], Docket No. 169.  The Alexanders argue that this statement in the letter is inadmissible, largely because they contend that § 14(c) claims were not limited to 5 acres.  But whether Clarence's § 14(c) claim was more than 5 acres is not a material fact, given that both what the Alexanders contend should have been included in Clarence's claim is more than five acres and what was in fact reconveyed to him was more than five acres. Thus, there is no need for the court to consider this argument.

[20]Clarence Alexander Deposition at 46:7-47-7, Exhibit Q, Plaintiffs' Reply, Docket No. 169.

[21]Lawrence Deposition at 80:19-23, Exhibit I, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[22]Lawrence Deposition at 27:12-28:3, Exhibit B, Defendants' Surreply Brief, Docket No. 184.

[23]Id. at 47:1-5; 100:9-20.

§ 14(c) claim,[24] but he testified that he did tell Lawrence not to include the pond area, by which he meant not to "measure" it.[25] Clarence may have been indicating to Lawrence that the pond area should not be included as part of the acreage of his § 14(c) claim, not that the pond area should not be within the boundaries of his § 14(c) claim.

GZ Corporation submitted the FYMOB to the BLM on April 11, 2008.[26] The FYMOB consisted of two sheets but it was accompanied by supporting documents, which included the

> Agreement with the City of Fort Yukon, G.Z. Corporation, and the Gwichyaa Zhee Gwich'in Tribal Government (Including Amendments and Resolutions), List of all applicable surveys relating to the Map of Boundaries, List of all approved 14(c)(1) applicants with current phone numbers and addresses, [and] Individual Strip maps of all 14(c)(1) claims.[[27]]

On April 30, 2008, Al Breitzman, on behalf of the BLM, "accepted" the filing of the FYMOB. After accepting the FYMOB, the BLM sent a public notice "concerning all ANCSA 14(a) land reconveyance decisions" by the GZ Corporation to the Postmaster in Fort Yukon to be posted "on a bulletin board where residents passing through the area can read

---

[24]Clarence Alexander Deposition at 193:25-195:18, Exhibit C, Defendants' Surreply Brief, Docket No. 184.

[25]Id. at 131:25-132:5.

[26]Exhibit E, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[27]AR 2, Docket No. 130.

it."[28]  The notice stated that GZ Corporation had "now officially filed with the Bureau of Land Management (BLM) their final Alaska Native Claims Settlement Act (ANCSA) 14(c) Map of Boundaries."[29]  The notice provided that "[i]f you have an interest in the designated parcels, you should contact the Village Corporation to review the map of boundaries to be sure the map includes your claim."[30]  The notice further provided that

> [i]f you disagree with the Village Corporation's boundary decisions, you should contact the Corporation.  If the disagreement is not resolved, you must start a court action <u>within one year of the date shown above</u>.  If you have a dispute and do not start a court action within one year, you will forfeit your claim.[31]

And, the notice provided that "[t]he official filing date of the map of boundaries is:  April 11, 2008."[32]  In addition to the notice being posted at the Fort Yukon post office, it was also posted at the Alaska Commercial store and at the offices of plaintiffs.[33]  The same notice was also published in the <u>Anchorage</u> <u>Daily</u> <u>News</u> and the <u>Fairbanks</u> <u>Daily</u> <u>News-Miner</u>.[34]

---

[28]AR 226, Docket No. 126-2 at page 13 of 25.

[29]AR 227, Docket No. 126-2 at page 14 of 25.

[30]<u>Id.</u>

[31]<u>Id.</u>

[32]<u>Id.</u>

[33]Lawrence Deposition at 82:2-11, Exhibit I, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[34]AR 231-238, Docket No. 126-2 at pages 18-25 of 25.

The FYMOB showed Clarence's § 14(c) claim as claim 002R:



This matched the sketch map that was included with Clarence's § 14(c) application.[35]  But, in the supporting documents accompanying the FYMOB, there is an aerial map that includes the pond and the tip of the triangle as part of Clarence's § 14(c) claim:



There is a note in blue ink on Clarence's application which is included in the FYMOB supporting documents, which asks "is barge landing as marked on sketch? Excluded or

[35]AR 69, Docket No. 130.

included? or is aerial correct?"[36] And, there is a second note, in red ink, that states "using MOB Aerial."[37] There is no evidence in the record as to who wrote these notes.

Clarence avers that the aerial photograph "accurately shows the triangular boundaries of my 1984 § 14(c)(1) claim, formed by the Yukon River on one boundary, and formed by two roadways on the other two boundaries of my property[.]"[38] Clarence avers that his § 14(c) claim included "the Joe Ward barge area (formerly known as the McInnoy Slough area) and the pond area, both of which areas are located within the triangular boundaries shown on the aerial photograph."[39]

On May 1, 2009, the BLM "approved" the FYMOB "to be used as the plan of survey for the ANCSA 14(c) parcels shown hereon."[40] The BLM advised GZ Corporation that "[t]he one-year time clock" for disputes related to the FYMOB had "expired on April 30, 2009" and that "[t]he Fort Yukon ANCSA 14(c) survey will be executed in the future, as funding becomes available."[41]

---

[36]AR 67, Docket No. 130.

[37]Id.

[38]Affidavit of Defendant Clarence L. Alexander in Support of Defendants' Motion for Summary Judgment at 3, ¶ 19, Docket No. 164-1.

[39]Id. at 4, ¶ 20.

[40]AR 100003, Docket No. 127-1 at page 4 of 13.

[41]AR 100001, Docket No. 127-1 at page 2 of 13.

On August 3, 2010, a list of ANCSA 14(c) reconveyances for Fort Yukon showed Tract 19, which was Clarence's § 14(c) claim, as being 8.79+/- acres.[42]

In October 2010, Eric Stahlke, the Cadastral Survey manager for Tanana Chiefs Conference, advised the BLM that Clarence was "claiming the barge landing" as part of his § 14(c) claim, "though there is a state road that goes right to it."[43]

The April 27, 2011 "special instructions" for the Fort Yukon survey indicated that Clarence's § 14(c) claim (Tract 19) consisted of "8.79+- acres" and that it was "shown on Sheet 5 of the Plan of Survey."[44]  Sheet 5 of the Plan of Survey showed Tract 19 as being a triangular-shaped parcel similar to that shown in the aerial photo, but without the very tip of the triangle included in the tract.[45]  The special instructions gave the surveyor the authority to

> make minor adjustments to the Fort Yukon ANCSA 14(c) Plan of Survey due to unexpected conditions found during the course of the field survey and to avoid creating unmanageable slivers or strips of land.  Any major change will be coordinated with the Gwitchyaa Zhee Corporation and the Bureau of Land Management ANCSA 14(c) specialist.  All major changes will be documented and submitted to the Bureau of Land Manage-

---

[42]AR 100005, Docket No. 127-1 at page 6 of 13.

[43]AR 100007, Docket No. 127-1 at page 8 of 13.

[44]AR 100023, Docket No. 127-2 at page 11 of 22.

[45]AR 100036, Docket No. 127-3 at page 2 of 3.

ment ANCSA 14(c) Specialist to file with the Fort Yukon ANCSA 14(c) case file.[46]

On July 15, 2011, Stahlke was contracted by the BLM to do the Fort Yukon survey.[47]

Dacho avers that in the summer of 2011, he received a copy of a survey document that showed Clarence's § 14(c) claim as "consisting of 8.80 acres."[48] He avers that this survey document did not show the Joe Ward barge landing area as part of Tract 19.[49]

On September 8, 2011, Clarence signed an affidavit in which he averred that he had "reviewed the reconveyance requests submitted by the" GZ Corporation "to the BLM" and "[t]he 14(c) reconveyance map filed by the" GZ Corporation "does not accurately document my reconveyance request."[50] Clarence took this affidavit with him to a meeting of GZ Corporation's board of directors on September 8, 2011, which he attended along with Dacho.[51] According to the minutes from that meeting, the Alexanders complained about Clarence's § 14(c) claim not including the Joe Ward barge landing area and they asked that

---

[46]AR 100018, Docket No. 127-2 at page 6 of 22.

[47]AR 100047, Docket No. 127-8 at page 3 of 70.

[48]Affidavit of Demetrie [Alexander] at 3-4, ¶¶ 10-13, Docket No. 84-2.

[49]Id. at 4, ¶ 14.

[50]Affidavit of Clarence L. Alexander at 2, ¶¶ 7-8, Exhibit M, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[51]Exhibit N at 1, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

the boundaries be clarified.[52] The Board took no action on Clarence's § 14(c) claim at the meeting.[53]

But, on September 26, 2011, Fannie Carroll, the general manager of GZ Corporation, emailed Stahlke that she had "notice[d]" that Clarence's § 14(c) claim "goes around the pond[] and does not include the barge landing area on either side, how is it that the tract grew, to the now surveyed lot which goes beyond the same pond on the MOB?"[54] Stahlke responded on September 27, 2011, that "[w]hy [the BLM] added the pond onto Tract 19 and boundaries that expand past the MOB location is a question I cannot answer. Perhaps it was to eliminate an unmanageable sliver between the original barge land[ing] road and Mr. Alexander's application."[55]

After the September 2011 board meeting, Dacho "contacted the BLM office in Anchorage" and spoke to "Al Breitzman [who] told me that after the one year statute of limitations had run, the only way to change the survey was either by the surveyor or by GZ Corp., and that there was no legal recourse available at that point in time[.]"[56]

---

[52]Id. at 1-2.

[53]Id. at 4.

[54]AR 100056, Docket No 127-8 at page 12 of 70.

[55]Exhibit S at 3, Docket No. 86-2.

[56]Dacho Alexander Affidavit at 5, ¶¶ 22-23, Docket No. 84-2.

In November 2011, the Alexanders, along with attorney Mike O'Brien, met with Stahlke and the president of the Tanana Chiefs Conference to discuss the Alexanders' contention that Clarence's § 14(c) claim did not include all the land he thought it should.[57] In response to plaintiffs' first requests for production, the Alexanders stated that O'Brien "attended [this] 2011 TCC meeting in Fairbanks with [them] as [their] attorney."[58] On November 14, 2011, the Alexanders signed a letter that was sent to the president of the Tanana Chiefs Conference to memorialize the meeting.[59] In the letter, the Alexanders stated that "at issue is .3 acres claimed by" Clarence "on the westernmost point of his requested conveyance. . . ."[60]

On May 31, 2012, Breitzman advised GZ Corporation that the survey for Clarence's § 14(c) claim was

> correct relative to the submitted Map of Boundaries. The Map, when compared to the detailed information in the binder, was a bit unclear as to the extent of the claim. The Map and one site diagram showed the claim stopping short of the road to the barge landing. Another drawing in the binder shows the boundaries of the claim over a blown up aerial photo and has the claim all the way over to the road. After TCC staff on the ground discussed with Corp. reps, we resolved the ambiguity in

---

[57]Affidavit of Defendant Demetrie (Dacho) Alexander [etc.] at 6, ¶ 29, Docket No. 86-1.

[58]Exhibit P at 6, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[59]Exhibit O, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[60]Id. at 1.

favor of the claimant and brought the claim all the way over to the road.

There is no ambiguity with regard to the barge landing. The Map of Boundaries as well as the detailed drawings in the binder all show Mr. Alexander's claim curving around but not including the barge landing.[61]

On March 13, 2013, the BLM sent a "completed ANCSA 14(c) Survey for Fort Yukon" and an "ANCSA 14(c) plat" to GZ Corporation for its review and approval.[62]

On April 8, 2013, Carroll advised the BLM that GZ Corporation had found that "the surveyed selections indeed did not correctly execute our submitted Map of Boundaries."[63] "First, . . . on our Map of Boundaries, 002R does not match your BLM Tract 19. The Map of Boundaries goes up to the pond, your surveyed area is up to the road."[64]

On April 19, 2013, John Pex of the BLM sent a letter to Stahlke concerning "Tract 19."[65] In the letter, Pex stated that "[t]his is a change to Tract 19 of the Fort Yukon 14(c), platting it as 2 Tracts, Tract 19 and Tract 19A. This will not require any field work."[66] "Tract 19 will be platted as shown on the attached example, all pertinent sheets of the Fort

_____

[61]AR 100057, Docket No. 127-8 at page 13 of 70.

[62]AR 100073, Docket No. 127-8 at page 29 of 70.

[63]AR 100075, Docket No. 127-8 at page 31 of 70.

[64]Id.

[65]AR 100083, Docket No. 127-8 at page 39 of 70.

[66]Id.

Yukon 14(c) will be edited."[67]  The attached example showed Tract 19 as excluding the pond area and the area at the tip of the triangle.[68]

On May 8, 2013, the BLM again sent the § 14(c) completed surveys and plats to GZ Corporation for review and approval.[69]  The BLM noted that "[a]t the suggestion of the Corporation, the [BLM] modified Tract 19 to more fully comply with the submitted Map of Boundaries.  This change should bring the project in full agreement with the submitted Map of Boundaries."[70]

On July 22, 2013, Carroll wrote to Breitzman about the modification to Tract 19.[71]  Carroll wrote that GZ Corporation had "simply requested the survey [match] the map of boundaries which [was] submitted by our village corporation, yet now we find you created a 19A tract.  There is no 19A tract.  We need your agency to make this correction."[72]

On July 25, 2013, Breitzman responded:

> At the suggestion of the Corporation, the Bureau of Land Management (BLM) modified Tract 19 to more fully comply with the submitted Map of Boundaries.  This change should bring the project in full agreement with the submitted Map of

---

[67]Id.

[68]AR 100084, Docket No 127-8 at page 40 of 70.

[69]AR 100085, Docket No. 127-8 at page 41 of 70.

[70]Id.

[71]AR 100088, Docket No. 127-8 at page 44 of 70.

[72]Id.

Boundaries. Tract 19A was created to identify the parcel removed from Tract 19 and does not imply a valid claimant for Tract 19A. Tract 19A was created as an administrative lot because we had to give that part removed from what would have been the proposed Tract 19 some sort of identifier. Tract 19A will be retained by the Corporation.[73]

On September 26, 2013, Frannie Hughes (formerly Fannie Carroll) advised Breitzman that GZ Corporation was "still . . . not pleased with the divided tract 19, we feel you should not include nor name tract 19A."[74] Hughes noted that "MOB Tract 002R does not go to the road on the east, BLM surveyed Tract 19 to the road? MOB Tract 9 does not appear to match the []BLM surveyed Tract 9[.] Ours gave the river front and navigable area [to the City?], so the City could work on a boat dock."[75]

On October 18, 2013, Breitzman responded that "the identification of Lot 19A does not imply a valid claimant for this parcel."[76] Breitzman explained:

BLM does have the obligation to survey the valid claims identified on the Map of Boundaries. We also have survey obligations within the context of good survey practice. One such obligation is to give a unique identifier to any parcel we create. If we exclude the pond area from Lot 19 we have the authority (and some would argue the responsibility[)] to give it an identifier. This does not mean that the creation of Lot 19A implies a valid claimant for the parcel.

---

[73]AR 100091, Docket No. 127-8 at page 47 of 70.

[74]AR 100093, Docket No 127-9 at page 49 of 70.

[75]Id.

[76]AR 100097, Docket No. 127-8 at page 53 of 70.

An identifier such as Lot 19A will benefit the Corporation as they have a legal description of the parcel so [they] can move forward with any subsequent use or transfer without additional survey work (OR COST).[77]

It then appears that GZ Corporation involved Congressman Young's office in the survey issue. On January 30, 2014, Breitzman emailed a representative from Young's office (Erik Elam) that "BLM would be willing to make this one last modification to the ANCSA 14(c) plat for the Fort Yukon area (as shown in the series of 3 diagrams) if the Corporation would agree to then sign the plat as modified."[78] All three diagrams showed Tract 19 as 5.83 acres, Tract 19A as 2.77 acres, and the tip of the triangle as not part of any tract.[79] Diagrams 2 and 3 show that a small amount of land was taken from Tract 9 and added to Tract 19A.[80]

On March 11, 2014, Hughes emailed Elam and stated that GZ Corporation believed it was in its "best interest to select the First Option which was described in your February 18, 2014 email. This we agree will be the most [expedient] where the size difference of Tract 19 will be close enough in relation to the time and energy saved in scheduling a survey crew to the Yukon Flats once again."[81]

---

[77]Id.

[78]AR 100098, Docket No. 127-8 at page 54 of 70.

[79]AR 100103-100105, Docket No. 127-8 at pages 59-61.

[80]Id.

[81]AR 100106, Docket No. 127-8 at page 62 of 70.

On March 11, 2014, Hughes also sent plan of survey mylar maps to Breitzman showing "where we want Tract 19 to be adjusted[.] Then our village corporation will sign the maps as to finalize our 14c1 process."[82]

On May 22, 2014, Hughes advised Breitzman that GZ Corporation's Board of Directors had approved the "14C plats[.]"[83]

On June 2, 2014, the BLM issued its "Section 14(c) plat" for GZ Corporation, which showed Clarence's § 14(c) claim as Tract 19:[84]



Tract 19 as shown on the plat appears to have the same shape and boundaries as claim 002R has on the FYMOB.

---

[82]Id.

[83]AR 100107, Docket No. 127-8 at page 63 of 70.

[84]Exhibit G at 1, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

On Plat Sheet 1, which shows Tract 19, Tract 9, and Tract 19A, Stahlke certified

> that I have executed the ANCSA 14(c) Survey depicted on this plat, sheets 1-30, in conformity with the Special Instructions approved June 6, 2011, Contract No. L11AV20002, awarded July 15, 2011, the principles of survey described in the Manual of Surveying Instructions (2009), and in the specific manner described on this plat.[85]

On Plat Sheet 1, the president of GZ Corporation certified

> that the parcels created by this plat of survey, sheets 1-30 are on land conveyed to Gwitchyaa Zhee Corporation, . . . said parcels also fulfill all entitlements under the provisions of ANCSA 14(c) as requested by Gwitchyaa Zhee Corporation ANCSA 14(c) Map of Boundaries accepted April 11, 2008.[86]

And, on June 2, 2014, the BLM Chief Cadestral Surveyor of Alaska signed Sheet 1 of the plat, indicating that the BLM had "accepted" the survey and noting that the survey had been

> executed by Eric Stahlke, Registered Alaska Land Surveyor No. LS-6945, for Tanana Chiefs Conference, July 19 through September 10, 2011, in accordance with the specifications set forth in the Manual of Surveying Instructions (2009), Special Instructions dated April 27, 2011, approved June 6, 2011, Assignment Instructions dated July 15, 2011, and Notice to Proceed dated July 18, 2011.[87]

Plat 2014-78 was recorded with the State of Alaska, Department of Natural Resources Recorder's Office, Fairbanks Recording District, on June 10, 2014.

---

[85] AR 100118, Docket No. 127-9 at page 4 of 7.

[86] Id.

[87] Id.

On January 29, 2016, GZ Corporation issued a quitclaim deed to Clarence for "Tract 19 located in Section 12, T20N, R11E, Fairbanks Meridian, as described at pages 1 and 2 of Plat No. 2014-78 recorded June 10, 2014, in the Fairbanks Recording District."[88] The quitclaim deed was "recorded with the Alaska Department of Natural Resources Recorder's Office, Fairbanks Recording District on February 2, 2016[.]"[89]

Plaintiffs contend that the Alexanders "have moved their belongings not only onto Tract 19, but also Tracts 9, 19A, and the triangle-shaped parcel of land at the end of Barge Landing Road."[90] Plaintiffs contend that they have repeatedly requested that the Alexanders remove their belongings from Tracts 9, 19A, and the triangle-shaped parcel of land at the end of Barge Landing Road.[91]

On February 26, 2018, plaintiffs commenced this action in state court. The Alexanders removed the action to this court on April 17, 2018.

In their amended complaint, plaintiffs assert a single ejectment claim. Plaintiffs seek to have the Alexanders "ejected from Tract 9, Tract 19A, and the triangle-shaped parcel of land at the end of the Barge Landing Road where it meets the Yukon River. . . ."[92] The

---

[88]Exhibit H at 1, Plaintiffs' Motion for Summary Judgment, Docket No. 153.

[89]Affidavit of Frannie Hughes at 2-3, ¶ 7, Docket No. 155.

[90]First Amended Complaint at 10, ¶ 28, Docket No. 95.

[91]Id. at 11, ¶ 29.

[92]Id. at 12, ¶ 33.

Alexanders have asserted six counterclaims against plaintiffs. In Count I, the Alexanders seek a declaration that GZ Corporation does not have unqualified fee simple title to the land at issue and that GZ Corporation failed to comply with certain § 14(c) requirements. In Count II, the Alexanders seek a declaration that GZ Corporation's conduct in 2008 as it related to the FYMOB and in 2013-2014 as it related to the alleged "replatting" process was "illegal and unconstitutional. . . ."[93] In Count III, the Alexanders seek a declaration that "GZ Corp.'s § 14(c)(1) policy [was] arbitrary, non-participatory, and illegal[.]"[94] In Count IV, the Alexanders assert what appears to be an equitable estoppel claim. In Count V, the Alexanders seek a declaration that Clarence "Alexander is entitled to a de novo hearing before the Court on his original § 14(c)(1) claim[.]"[95] In Count VI, the Alexanders assert a quiet title claim.

Plaintiffs now move for summary judgment that the statute of limitations precludes the Alexanders from seeking judicial review of Clarence's § 14(c) claim. The Alexanders move for summary judgment against plaintiffs on a variety of grounds and seek the dismissal of plaintiffs' first amended complaint.

---

[93]Defendants' Answer to First Amended Complaint; Affirmative Defenses; and Counterclaims at 28, ¶¶ 43-44, Docket No. 101.

[94]Id. at 32, ¶ 73.

[95]Id. at 39, ¶ 113.

Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The initial burden is on the moving party to show that there is an absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor.  Id. at 255.  "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'"  Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

By their counterclaims, the Alexanders are requesting that the court review plaintiffs' decisions as to Clarence's § 14(c) claim.  Plaintiffs contend that the court is precluded from doing so because any such review is subject to a one-year statute of limitations, which has long since passed.  43 U.S.C. § 1632(b) provides:

> Decisions made by a Village Corporation to reconvey land under
> section 14(c) of the Alaska Native Claims Settlement Act [43

-23-

U.S.C.A. § 1613(c)] shall not be subject to judicial review unless such action is initiated before a court of competent jurisdiction within one year after the date of the filing of the map of boundaries as provided for in regulations promulgated by the Secretary.

Plaintiffs argue that the Alexanders had one year from when the FYMOB was filed with the BLM in 2008 to seek judicial review of Clarence's § 14(c) claim. But, plaintiffs argue that the Alexanders did not seek judicial review of Clarence's § 14(c) claim until 2018 when they filed the Notice of Removal in this case, which was long after the one-year statute of limitations had passed in 2009.

The Alexanders first argue that Section 1632(b) has no application here because plaintiffs did not file the FYMOB "as provided for in regulations promulgated by the Secretary." 43 U.S.C. § 1632(b). The Alexanders argue that the requirements in 43 C.F.R. § 2650.5-4(c)(1) were conditions precedent for a valid map of boundaries[96] and plaintiffs' failure to comply means that the one-year statute of limitations in Section 1632(b) was never triggered. In particular, the Alexanders argue that the FYMOB is not a valid map of boundaries because plaintiffs failed to post the boundaries of Clarence § 14(c) claim "on the ground" prior to submitting the FYMOB and because GZ Corporation failed to resolve a

---

[96]The Alexanders argue that the court has already determined that the requirements of 43 C.F.R. § 2650.5-4 are conditions precedent in its order denying plaintiffs' motion to remand. In that order, the court determined that there were questions of federal law in this case associated with whether "plaintiffs [had] complied with the notice requirements associated with 14(c)(1) claims or the survey regulations. . . ." Order re Motion to Remand at 10-11, Docket No. 22.

known conflict prior to submitting the FYMOB. The Alexanders move for summary judgment that plaintiffs did not comply with the requirements of 43 C.F.R. § 2650.5-4(c).

Section 2650.5-4(c)(1) provides, in relevant part, that

> [t]he boundaries of the tracts described in paragraph (b) of this section shall be posted on the ground and shown on a map which has been approved in writing by the affected village corporation and submitted to the Bureau of Land Management. Conflicts arising among potential transferees identified in section 14(c) of the Act, or between the village corporation and such transferees, will be resolved prior to submission of the map.

Paragraph (b) provides that "[s]urveys will be made within the village corporation selections to delineate those tracts required by law to be conveyed by the village corporations pursuant to section 14(c) of the Act." 43 C.F.R. § 2650.5-4(b).

The Alexanders argue that plaintiffs failed to comply with the first sentence of subsection (c)(1) because they did not post the boundaries of Clarence's § 14(c) claim "on the ground" prior to submitting the FYMOB to the BLM and that, as a result, they failed to resolve a known conflict prior to submitting the FYMOB. The Alexanders point out that even the BLM's 2009 Manual of Surveying Instructions requires that the boundaries be "posted." Specifically, the Manual provides:

> When all the [§ 14(c)] claims are identified by the Village Corporation, they are posted on the ground and shown on a map. This map constitutes the origin of a plan of survey. The BLM then surveys, monuments, and plats the selected lands and the village conveyed lands for legal description purposes. The intent of the survey is to have the selected lands and village conveyed parcels surveyed in the same configuration, relative

position, and size as shown on the map submitted by the Village Corporation, as conditions allow.[97]

The Alexanders also point to the BLM's A.N.C.S.A. 14(c) Survey Guidelines as proof that plaintiffs were required to post boundaries of § 14(c) claims on the ground. The Guidelines contain a Map of Boundaries Checklist that provides, in relevant part:

> 43 C.F.R. § 2650.5-4(c)(1) requires that the surveys to be made for the ANCSA 14(c) claims within the Village Corporation selected lands shall be posted on the ground. "Posted on the ground" will be referred to in these guidelines as "staking." Check that the Map of Boundaries or cover letter addresses staking of the ANCSA 14(c) reconveyances.
>
> a. Has staking of parcels taken place at the time of submittal?
>
> b. Describe materials used for the corner staking.
>
> c. Any photo proof or mapped descriptions to help locate staked corners.
>
> d. If actual staking will be required just prior to the field survey, the Village Corporation must agree to comply with this obligation.[98]

The Alexanders contend that if plaintiffs had complied with the posting requirement, then the Alexanders would have known in 2008, when the FYMOB was completed, that plaintiffs were not including the pond area and the Joe Ward barge landing area in Clarence's § 14(c) claim. The Alexanders contend that this would have allowed plaintiffs to resolve the conflict

---

[97]Manual of Surveying Instructions, Docket No. 164 at page 6 of 7.

[98]AR 256, Docket No. 126-3 at page 18 of 39.

as to the proper boundaries for Tract 19 prior to submitting the FYMOB to the BLM, which is what the regulation intended. The Alexanders insist that plaintiffs' failure to comply with the requirements in the first sentence of subsection (c)(1) means that the FYMOB was never valid and that the one-year statute of limitations in Section 1632(b) was never triggered.

The first sentence of subsection (c)(1) did not require plaintiffs to post the boundaries of § 14(c) claims prior to submitting a map of boundaries to the BLM. Nor is such a requirement suggested by the Manual or the Guidelines on which the Alexanders rely. Both the Manual and the Guidelines suggest that the posting may be done during the surveying process. The FYMOB was not invalid because plaintiffs failed to post Clarence's § 14(c) claim "on the ground" prior to submitting the FYMOB to the BLM.

The Alexanders next argue that the one-year statute of limitations was never triggered because Clarence was not given actual notice that the FYMOB had been submitted to the BLM. The Alexanders appear to be moving for summary judgment on this issue. The Alexanders' notice argument is largely based on Ogle, 906 F. Supp. 1321. There, the court found that

> Section 14(c) . . . contemplates that the village corporations will provide reasonable notice to 14(c) claimants both prior to and after filing their map of boundaries with the Department of the Interior. Notice prior to the filing is necessary in order to assure that bona fide claims are recognized in the map, and notice subsequent to the filing of the map is necessary to insure that those whose claims are denied are alerted to their right to judicial review.

Id. at 1329. The court explained that "the Supreme Court has more recently held that notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, if the party's name and address are reasonably ascertainable." Id. at 1330. The Alexanders argue that there can be no dispute that plaintiffs were aware of Clarence's name and address and thus could have provided him with actual notice that the FYMOB had been submitted.

Plaintiffs do not expressly argue that the notice that was provided in 2008 comports with due process and it more than likely did not. GZ Corporation had the names and addresses of the § 14(c) applicants[99] and could have easily provided them actual notice by mail that the FYMOB had been submitted to the BLM. But, even if the notice which was provided in 2008 was inadequate, that does not change the fact that by 2011, the Alexanders had actual notice that Clarence's § 14(c) claim did not include all the land which he thought it should. Even if the one-year statute of limitations was not triggered in 2008 because adequate notice was not given, the notice problem was cured by 2011, which means that the one-year statute of limitations in Section 1632(b) was triggered by at least November 2011. The notice problem in 2008 does not mean, as the Alexanders argue, that the statute of limitations in Section 1632(b) was never triggered.

---

[99]AR 33, Docket No. 130.

The Alexanders next argue that plaintiffs are equitably estopped from raising a statute of limitations defense. "The doctrine of equitable estoppel, often referred to as fraudulent concealment, is based on the principle that a party 'should not be allowed to benefit from its own wrongdoing.'" Estate of Amaro v. City of Oakland, 653 F.3d 808, 813 (9th Cir. 2011) (quoting Collins v. Gee West Seattle LLC, 631 F.3d 1001, 1004 (9th Cir. 2011)). "The doctrine 'focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit.'" Id. (quoting Santa Maria v. Pac. Bell, 202 F.3d 1170, 1176 (9th Cir. 2000)). The Alexanders have the

> burden of pleading and proving the following elements of equitable estoppel:
>
>> "(1) knowledge of the true facts by the party to be estopped, (2) intent to induce reliance or actions giving rise to a belief in that intent, (3) ignorance of the true facts by the relying party, and (4) detrimental reliance."

Id. (quoting Bolt v. United States, 944 F.2d 603, 609 (9th Cir. 1991)). "Equitable estoppel ordinarily presents a question of fact unless only one reasonable conclusion can be drawn from undisputed facts." Shamrock Development Co. v. City of Concord, 656 F.2d 1380, 1386 (9th Cir. 1981).

The Alexanders argue that plaintiffs concealed that the aerial photograph, which was part of the documents supporting the FYMOB, showed Tract 19 as including the pond area and the Joe Ward barge area but that the FYMOB did not include these areas as part of Tract 19. But this argument fails because there is no dispute that the Alexanders had actual notice

by at least 2011 that Clarence's § 14(c) claim did not include all the land that he believed it should. Once Clarence had actual notice that his § 14(c) claim was not as large as he believed it should be, he could have brought suit against plaintiffs. Although the Alexanders contend that they were told in 2011 by GZ Corporation that they had no legal recourse,[100] the Alexanders were not required to accept plaintiffs' representations given that the Alexanders had their own counsel in 2011.

The Alexanders also argue that plaintiffs concealed their contact with the BLM in 2013/2014 when they were working with BLM to reduce the size of Tract 19. The Alexanders argue that plaintiffs had a map that showed the pond area and the Joe Ward barge area within the boundaries of Tract 19 but that they later changed their position about the boundaries of Tract 19 without notifying Clarence. The Alexanders appear to be arguing that plaintiffs should have told Clarence that they were working on getting the boundaries of Tract 19 changed in 2013/2014. The Alexanders contend that all plaintiffs had to do in 2013/2014 was get in touch with Clarence, which they knew how to do, and allow him to be part of the process. But because they failed to do so, the Alexanders argue that plaintiffs should be equitably estopped from raising a statute of limitations defense.

This argument fails because in 2013-2014, GZ Corporation was not working with the BLM to reduce the size of Clarence's § 14(c) claim. Rather, GZ Corporation was working with the BLM to ensure that the boundaries for Tract 19 matched what was shown on the

---

[100]Dacho Alexander Affidavit at 7, ¶ 34, Docket No. 86-1.

FYMOB. While GZ Corporation could have notified Clarence about its contact with the BLM in 2013/2014, there was no requirement that it do so. Thus, the fact that it did not notify Clarence of its contact with BLM in 2013/2014 does not mean that GZ Corporation is equitably estopped from asserting a statute of limitations defense.

The Alexanders next argue that equitable tolling applies here. "'Equitable tolling may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim.'" Coppinger-Martin v. Solis, 627 F.3d 745, 750 (9th Cir. 2010) (quoting Santa Maria v. Pac. Bell, 202 F.3d 1170, 1178 (9th Cir. 2000)). "Equitable tolling does not depend on the defendant's wrongful conduct; rather, it focuses on whether the plaintiff's delay was excusable." Id. "'If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs.'" Id. (quoting Santa Maria, 202 F.3d at 1178). "'Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.'" Okafor v. United States, 846 F.3d 337, 340 (9th Cir. 2017) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).

The Alexanders argue that they used reasonable diligence after they learned of the existence of Tract 19A in 2017. The Alexanders argue that they did not know that plaintiffs had reduced the size of Clarence's § 14(c) claim in 2008 because plaintiffs did not give

Clarence adequate notice that the FYMOB had been submitted to the BLM. They appear to be arguing that the extraordinary circumstance that stood in their way was that plaintiffs were concealing material information from them.

The Alexanders' equitable tolling argument fails because the Alexanders retained counsel in 2011. "[O]nce a claimant retains counsel, tolling ceases because she has gained the means of knowledge of her rights and can be charged with constructive knowledge of the law's requirements." Leorna v. U.S. Dep't of State, 105 F.3d 548, 551 (9th Cir. 1997). It is undisputed that the Alexanders had counsel in 2011. Although Dacho avers that this attorney (O'Brien) was a family friend and only helped them out by accompanying them to a meeting with the Tanana Chiefs Conference in November 2011,[101] the Alexanders claimed attorney-client privilege between O'Brien and Dacho.[102] This indicates that the Alexanders believed that O'Brien was helping them in his capacity as a lawyer, not simply in his capacity as Dacho's friend. At best, the one-year statute of limitations would have been tolled until November 2011, which means the Alexanders would have had to bring their challenges to the FYMOB and the boundaries of Clarence's § 14(c) claim by November 2012, which they did not do.

---

[101]Affidavit of Defendant Demetrie (Dacho) in Support of Defendants' Motion for Summary Judgment at 3, ¶¶ 10-16, Docket No. 164-2.

[102]Defendants' Response to Plaintiffs' First Request for Production at 7, Exhibit 3, Third-Party Defendant's Memorandum in Support of Motion to Dismiss, Docket No.142.

The Alexanders next argue that the statute of limitations in Section 1632(b) does not preclude review of Clarence's § 14(c) claim because their claims did not accrue until 2018. "Normally, a statute of limitations period begins to run when an injury occurs, which is usually equivalent to when the cause of action accrues.  In the context of fraud, however, the injury and accrual of the cause of action may occur at a time distinct and separate from the commencement of the statute of limitations period." Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1412 (9th Cir. 1987).  "In fraud cases, a cause of action is generally said to accrue when a defendant commits the last overt injurious act." Id.  "However, the statute of limitations is not triggered until the defrauded individual has actual or inquiry notice that a fraudulent misrepresentation has been made." Id.  The Alexanders argue that they did not have actual or inquiry notice that plaintiffs were making fraudulent misrepresentations until 2018 when they received documents, pursuant to a FOIA request, relating to plaintiffs' contact with the BLM in 2013/2014.

This argument by the Alexanders fails largely because the Alexanders have not pled a fraudulent concealment counterclaim.  As for the counterclaims that they have pled, it is undisputed that they had actual knowledge by 2011 that Clarence's § 14(c) claim did not include all of the land that he believed it should.  The Alexanders' counterclaims had thus accrued long before they received documents pursuant to their FOIA request.

The Alexanders next argue that the continuing violations doctrine applies here.  "The continuing violations doctrine functions as an exception to the discovery rule of accrual

allowing a plaintiff to seek relief for events outside of the limitations period." Bird v. Dep't of Human Services, 935 F.3d 738, 746 (9th Cir. 2019) (citation omitted). The Ninth Circuit has "recognized two applications of the continuing violations doctrine: first, to a series of related acts, one or more of which falls within the limitations period, and second, to the maintenance of a discriminatory system both before and during [the limitations] period." Id. (citation omitted). It is not entirely clear which application of the doctrine the Alexanders are attempting to rely on here. To the extent they are relying on the "serials acts branch," the Ninth Circuit recently observed that "[e]xcept for a limited exception for hostile work environment claims—not at issue here—the serial acts branch is virtually non-existent." Id. at 748. As for "the systematic branch," the Ninth Circuit has "consistently refused to apply the systematic branch to rescue individualized claims that are otherwise time-barred." Id. The Alexanders argue that plaintiffs have been continuously violating 43 C.F.R. § 2650.5-4(c)(1) since 2008 because the boundaries of Clarence's § 14(c) claim have never been posted "on the ground" and that plaintiffs have continuously violated Section 2650.5-4(c)(2)'s "no additional survey work" prohibition since 2013/2014.

The continuing violations doctrine does not apply here. The Alexanders have raised individualized claims, which the continuing violations doctrine cannot save. Moreover, there has been no continuing violations of Section 2650.5-4(c). Rather, the Alexanders are arguing that there has been a continuing impact from the alleged violations of Section 2650.5-4(c).

But, "a mere continuing <u>impact</u> from past violations is not actionable." <u>Knox v. Davis</u>, 260

F.3d 1009, 1013 (9th Cir. 2001) (citations omitted).

Turning then to the remaining arguments made by Alexanders in their motion for

summary judgment, the Alexanders first argue that plaintiffs' complaint should be dismissed

because plaintiffs have not stated a plausible claim. But, the plausibility standard under

<u>Iqbal/Twombly</u> has no application here. This standard applies to Rule 12(b)(6) motions to

dismiss, not to motions for summary judgment. But even if the Rule 12(b)(6) standard

applied here, the Alexanders' argument that plaintiffs' ejectment claim is not plausible would

fail. The elements of an ejectment claim under Alaska law are "a legal estate in the property

and a present right to possession of the property." <u>Fink v. Municipality of Anchorage</u>, 379

P.3d 183, 190 (Alaska 2016) (citations omitted). Plaintiffs' first amended complaint

plausibly alleges that plaintiffs have a legal estate in the property in question and a present

right to possession of that property.

The Alexanders next move for summary judgment that plaintiffs failed to comply

with 43 C.F.R. § 2650.5-4(c)(2), which provides in relevant part:

> No surveys shall begin prior to final written approval of the map
> by the village corporation and the Bureau of Land Management.
> After such written approval, the map will constitute a plan of
> survey. Surveys will then be made in accordance with the plan
> of survey. No further changes will be made to accommodate
> additional section 14(c) transferees, and no additional survey
> work desired by the village corporation or municipality within
> the area covered by the plan of survey or immediately adjacent
> thereto will be performed by the Secretary.

The Alexanders argue that in this case, there was additional non-field survey work done by the BLM in 2013/2014 at the request of GZ Corporation. The Alexanders insist that the BLM, working in concert with GZ Corporation, improperly created Tract 19A in 2013/2014.

There was no additional non-field survey work done in 2013/2014. The undisputed facts show that GZ Corporation requested that Clarence's § 14(c) claim be shown on the plat with boundaries that matched the boundaries for his claim on the FYMOB. This meant that the pond area had to be excluded. The BLM required that this excluded area, which had already been surveyed, be called something, i.e., Tract 19A. Nothing the BLM or GZ Corporation did in 2013/2014 violated Section 2650.5-4(c)(2).

The Alexanders next move for summary judgment that there are misrepresentations on the recorded plat, Plat 2014-78. As set out above, on the plat, both Stahlke and the BLM indicated that the survey was in accordance with what was done in 2011. The Alexanders argue that this is a misrepresentation because the plat shows Tract 19A, and Tract 19A was not created until 2013/2014. Moreover, the Alexanders argue that Tract 19 was surveyed as 8.79 acres, which is not what is depicted on Sheet 1 of the plat.

There were no misrepresentations on the recorded plat. All the survey work had been done in 2011. All that occurred in 2013/2014 was that GZ Corporation worked with the BLM to ensure that the FYMOB matched the plat that was going to be recorded.

Finally, the Alexanders move for summary judgment that Clarence's § 14(c) claim did not "stay[] the same as the Map of Boundar[ies]."[103]  As proof, the Alexanders point to the hand-drawn sketch and the aerial photograph[104] that were attached in Clarence's claim in the documents accompanying the FYMOB.  As discussed above, the aerial photo showed both the Joe Ward barge landing area and the pond area as part of Clarence's § 14(c) claim.

Plaintiffs argue that the aerial photo is irrelevant because it is not what was reflected on the FYMOB.  Plaintiffs argue that the operative document is the FYMOB and that no other map or document submitted in support can change what is reflected on the FYMOB.  And, here, plaintiffs contend that it is undisputed that what is on the FYMOB is exactly what was reflected on the plat that was recorded after the surveying was complete.  But, the Alexanders argue that the aerial photo was part of the FYMOB and they insist that this photo showed that there was clearly a conflict as to the boundaries of Clarence's § 14(c) claim that should have been resolved, but was not, prior to GZ Corporation submitting the FYMOB to the BLM.[105]

---

[103]Deposition of Frannie Hughes at 39:22-23, Exhibit B, Defendants' Motion for Summary Judgment Against Plaintiffs, Docket No. 163.

[104]Plaintiffs interpret the Alexanders' motion for summary judgment as requesting summary judgment that this aerial photograph constitutes admissible hearsay under FRE 801. To the extent that the Alexanders have made such a request, it would be a request for an evidentiary ruling, not something on which the court would grant summary judgment.  No one has disputed that the aerial photograph is not evidence that the court can considered in deciding the pending motions for summary judgment.

[105]The Alexanders argue that plaintiffs have "judicially admitted" that there was an
(continued...)

The foregoing suggests that there may have been some questions as to the boundaries of Clarence's § 14(c) claim, despite the fact that the boundaries on the plat that was recorded match the boundaries shown on the FYMOB. But that does not mean that the Alexanders are entitled to summary judgment that Clarence's § 14(c) claim did not "stay[] the same as the Map of Boundar[ies]."[106] The fact remains that the Alexanders knew in November 2011 that Clarence's § 14(c) claim did not include all of the land that he thought it should. That means that any challenges to the FYMOB and the boundaries of Clarence's § 14(c) claim had to be brought by November 2012. The challenges to the FYMOB and the boundaries of Clarence's § 14(c) claim that the Alexanders raise in this action were brought too late. These challenges are barred by the one-year statute of limitations in Section 1632(b).

Conclusion

Plaintiffs' motion for summary judgment is granted. The Alexanders are time-barred from seeking judicial review of Clarence's § 14(c) claim.

The Alexanders' motion for summary judgment is denied.

DATED at Anchorage, Alaska, this 19th day of December, 2019.

/s/ H. Russel Holland
United States District Judge

---

[105](...continued)
unresolved conflict because in their opposition they admitted that the aerial photo was part of the supporting documents submitted to the BLM. There have been no judicial admissions here.

[106]Hughes Deposition at 39:22-23, Exhibit B, Defendants' Motion for Summary Judgment Against Plaintiffs, Docket No. 163.